## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION

| | | |
|---|---|---|
| MAX MALLORY, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **CLASS ACTION** |
| v. | ) ) | No. _____ |
| CONSUMER SAFETY TECHNOLOGY, LLC d/b/a INTOXALOCK, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

_____

## CLASS ACTION COMPLAINT
_____

Max Mallory ("Plaintiff") brings this action on behalf of himself and others similarly situated ("the Class") against Defendant Consumer Safety Technology, LLC d/b/a Intoxalock ("Intoxalock") for breach of contract, violation of the Iowa Private Right of Action for Consumer Frauds Act (Iowa Code § 714H.1), or alternatively, the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-109, common law fraud, unjust enrichment, declaratory relief, and injunctive relief. Plaintiff makes the following allegations pursuant to the investigation of counsel and upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge:

# TABLE OF CONTENTS

I.     NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      A.     History of Ignition Interlock Devices. . . . . . . . . . . . . . . . . . . . . . . . 6

      B.     Intoxalock's Company History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.     Overview of Ignition Interlock Devices and How They Function. . . . 10

      D.     Plaintiff Signed Five Leases with Intoxalock to Lease IIDs
           for Two Vehicles Over a 25-Month Period. . . . . . . . . . . . . . . . . . . . 12

           1.     Tennessee Ignition Interlock Device Requirements. . . . . . . . 12

           2.     Plaintiff Contracts with Intoxalock to Lease an IID . . . . . . . 12

           3.     Intoxalock Misrepresented the Typical Monthly Costs
                of IIDs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           4.     Intoxalock Misrepresented That IIDs Would Not
                Damage Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      E.     Intoxalock's Breaches, Overcharges, and Excessive Fees. . . . . . . . . 21

      F.     Online Consumer Complaints Confirm that the IIDs Damage Car
           Batteries and Unscrupulous "Lockouts" and "Lockout Fees". . . . . . 29

      G.     Plaintiff and the Class Have Been Injured By Intoxalock's Actions
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

V.     APPLICABLE SUBSTANTIVE LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VI.    CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VII.   CAUSES OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

COUNT ONE – Breach of Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

COUNT TWO – Violation of Iowa Private Right of Action for Consumer
Frauds Act (Iowa Code § 714H.1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

COUNT THREE – (Alternatively) Violation of Tennessee Consumer
Protection Act, Tenn. Code Ann. § 47-18-101 et seq . . . . . . . . . . . . . . . . . . . 48

COUNT FOUR – Common Law Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

COUNT FIVE – Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VIII. JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

IX. PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

# I. NATURE OF ACTION

1. This class action seeks relief for the Plaintiff and on behalf of a Class of consumers – former DUI offenders seeking restoration of their driving privileges, forced by their state's laws to contract with state-approved predatory companies who lease Ignition Interlock Devices ("IID").[1] This case challenges the highly exploitive business practices of one such company – Consumer Safety Technology, LLC d/b/a Intoxalock ("Intoxalock").

2. Plaintiff and other Class members – all of whom have otherwise fulfilled their legal obligations to have their driving privileges restored, including incarceration, fines, court costs, driving schools, and license reinstatement fees – have little, if any, bargaining power to negotiate Intoxalock's "take it or leave it" lease terms. Through Intoxalock's unlawful, unfair, deceptive, and/or fraudulent business practices, Plaintiff and other Class members have been forced to pay hundreds of dollars in overcharges, excessive fees, and sham "lockout" penalties before having the devices removed from their vehicles. They had little, if any, choice but to pay such charges, unlawful or not, as challenging the fees or missing a single payment could result in not having their driving privileges restored for a significant additional period.

3. Intoxalock markets itself as the number one Ignition Interlock Device ("IID") brand in the United States. Every IID varies, but all require users to submit a

---

[1]An IID is a small, handheld breathalyzer for car ignitions that is installed to prevent users from being able to start their vehicle after drinking alcohol. Most IIDs are made of a handheld unit, mouthpiece, relay cord, and a camera unit.

breath sample in order to test their Breath Alcohol Content (BrAC).[2] The vehicle will only start if the user's breath sample passes. IIDs are often mandated by courts for people who have DUI offenses in order to legally resume driving abilities.

4.     To use an IID, a user will be required to blow into a mouthpiece prior to starting the user's vehicle so the device can measure his BrAC. After the device calculates the driver's blood alcohol content, the device displays a message telling the driver to start the vehicle. A series of "rolling retests" occur periodically as the vehicle is being driven, and breath samples are given with the same process used to initially start the vehicle.

5.     Each state regulates its own IID program and approves which manufacturers or providers may contract with customers in that respective state. While there is some competition in the IID market, *e.g.*, six providers are approved to do business in Tennessee, an IID consumer has little, if any, bargaining power when entering into a lease agreement. If the terms offered are one-sided, there is little, if anything, an IID consumer can do, other than look to one of the other equally predatory companies approved by their state.

6.     Moreover, to seek restoration of their driving privileges, Plaintiff and Class members were required to sign up with an approved provider. All of them signed

---

[2]BrAC refers to your breath alcohol concentration. The BrAC detected by your IID must be under a limit set by your state (usually 0.02) before you're allowed to start and operate your vehicle. Each state determines how many attempts you have at providing a passing sample. *See* https://www.intoxalock.com/ignition-interlock-devices/faq/

leases, drafted by Intoxalock, which they often did not even see until after the IID was installed by Intoxalock's service center at a significant fee (for Plaintiff, about $175.00). If they wanted to drive again, Plaintiff and Class members also knew that not only did they have to accept whatever lease terms were offered them, but they had to strictly abide by the rigorous protocol the lease terms required.

7.      The leases purportedly informed Plaintiff and Class members of the amounts they had to pay and the dates by which they had to pay them; advised them of the total payment amount to be paid during the lease-term; and advised them of still other fees and charges for which payment may be necessary from time to time. But, as Plaintiff and Class members discovered, Intoxalock's IID business is a racket, designed to exploit these particularly vulnerable consumers by extracting duplicative, unnecessary, unreasonable, and excessive fees and overcharges from them.

8.      Intoxalock's unfair and deceptive scheme is driven by what can only be described as "sham" lockouts and unlawful penalties in the form of "lockout fees" that are routinely imposed against consumers who have faithfully performed their lease and legal obligations. By the time Plaintiff was able to have the IID removed from his vehicle – *after 25 months* – he had directly paid Intoxalock hundreds of dollars in excess lockout fees and other overcharges and had no fewer than four car batteries – on two different vehicles – ruined by Intoxalock's IID, requiring him to pay well over $1,000 to purchase new batteries, just to keep from paying the sham lock out fees.

9.      Plaintiff brings this proposed class action against Intoxalock on behalf of himself and all other similarly situated Intoxalock consumers in the United States who

were unlawfully, deceptively, or fraudulently charged duplicative, unnecessary, unreasonable, and excessive fees in breach of their leases, in violation of Iowa's Consumer Fraud Statute (or, for the proposed Tennessee class only, for violation of the Tennessee Consumer Protect Act), via fraud, and/or for unjust enrichment.

10. For these claims, Plaintiff and the Class seek compensatory damages, treble damages where allowed, equitable relief, restitution, attorneys' fees, and costs against Intoxalock.

## II. JURISDICTION AND VENUE

11. This Court has jurisdiction pursuant to 28 U.S.C. §1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, et seq., which vests original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount-in-controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant. There are more than 100 potential Class members across the United States, the aggregate amount-in-controversy exceeds $5 million, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than Tennessee.

12. This Court has personal jurisdiction over Intoxalock because Intoxalock conducts substantial business within Tennessee and maintains significant, continuous, and pervasive contacts here. For example, Intoxalock is one of six Ignition Interlock Device manufacturers approved by the State of Tennessee to conduct business in this state and does substantial business in this district. It also has ninety-two (92) authorized approved service centers or installation locations in the state.

-4-

13. Venue is appropriate in this district under 28 U.S.C. § 1391(b) and (c), because during the Class Period, Intoxalock transacted business here, could be found here, or had agents in this district and because a substantial portion of the affected trade and commerce described in this Complaint occurred here.

14. At all pertinent times, Intoxalock leased Ignition Interlock Devices to consumers in this District, across Tennessee, and throughout the United States.

## III. PARTIES

15. Plaintiff, Max Christian Mallory ("Plaintiff"), is a natural person who resides in the State of Tennessee. On or about December 2019, Plaintiff contracted with Intoxalock to lease an Ignition Interlock Device, specifically an eLERT® Device (Model 1001A), including a handheld, relay(s), cord, wire harness, mouthpieces, camera and global positioning system (GPS).

16. Defendant, Consumer Safety Technology, LLC, doing business as "Intoxalock" ("Intoxalock"), is a Delaware corporation headquartered at 11035 Aurora Ave., Bldg I, Urbandale, IA 50322-7902. The company developed technology used by Ignition Interlock Devices. Intoxalock may be served with process through its designated Registered Agent: Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

-5-

# IV. FACTUAL ALLEGATIONS

## A. History of Ignition Interlock Devices

17. The Tennessee Department of Safety & Homeland Security Ignition Interlock Program defines[3] an Ignition Interlock Device ("IID") as:

> "a device which connects a motor vehicle ignition system to a breath-alcohol analyzer and prevents a motor vehicle ignition from starting if a driver's blood alcohol level exceeds the calibrated setting on the device. In other words, an ignition interlock is an alcohol detection device that is installed on a motor vehicle and analyzes breath samples of the driver. The device prevents an alcohol-impaired person from starting the vehicle and requires random retests be submitted while the vehicle's engine is running. In Tennessee, all ignition interlock devices must include a camera."

18. The purpose of an IID is to determine a person's breath alcohol concentration (BrAC). It is installed into a person's vehicle because of a court and/or state requirement following a DUI offense. If a user takes and fails the device's test, the user's vehicle will not start.

19. In 1962, Naoyoshi Taguchi noticed a newspaper article on a propane gas explosion at Lake Yamanaka in Japan. He recognized the serious need for a gas leak detector and began a series of experiments to find functional materials for gas detection. Taguchi became the first person in the world to develop a semiconductor device that could detect low concentrations of combustible and reducing gases when used with a simple electrical circuit. One type of gas detected by Taguchi's device was

---

[3]https://tnignitioninterlock.zendesk.com/hc/en-us/articles/360030986333-What-is-an-Ignition-Interlock-Device-

-6-

alcohol. This sensor – the Taguchi Gas Sensors ("TGS") – became the industry standard method of detecting alcohol in drivers.[4]

20.     In the late 1960s, the Borg Warner Corporation, a research laboratory in Des Plaines, Illinois, developed and produced a working prototype of the Ignition Interlock Device,  a sample breath alcohol tester that interrupted the starting circuit of the vehicle in which it was installed.[5]

21.     In 1971, the first "inebriate inhibitor system" was patented by a former Manhattan Project scientist at Borg Warner who had previously helped develop the atomic bomb. Interlocks with alcohol-sensing devices (instead of performance-based devices) became the standard in the 1980s. In 1985, the Ignition Interlock was finally presented to various governmental and private interests for public use.[6]

22.     In 1985, the first court-ordered Ignition Interlock occurred in Denver, Colorado, after which several states implemented their use in pilot programs. In the 1990s, alcohol interlocks with additional features that prevented overcoming the interlock device, such as running retests, were developed. In 1992, the National Traffic Safety and Highway Association ("NHTSA") issued the first certification guidelines for alcohol interlock devices, which advised states how to evaluate interlock hardware that was on the marketplace and available for installation.

---

[4] https://worldwide.espacenet.com/patent/search/family/021830591/publication/US3695848A?q=pn%3DUS3695848

[5] https://www.smartstartinc.com/blog/history-ignition-interlock-device/

[6] https://www.smartstartinc.com/blog/history-ignition-interlock-device/

23.     From 1992 to 2005, many changes contributed to the significant growth of Ignition Interlocks with technological and program advancements. These changes led to the current Ignition Interlock program in the United States. One change saw the implementation of the fuel-cell alcohol sensor, rather than the TGS. This electrochemical device is ethanol-specific, and provides more accurate and reliable breath test results. Most certified Ignition Interlocks have a fuel-cell sensor.[7]

24.     Federal legislation in 1998 and 2012 provided financial incentives to states that passed their own interlock legislation. As of 2021, all states had alcohol interlock programs, with variations among the states as to whether the devices are mandatory and for which offenders they are implemented. Initially, most of these laws were discretionary. Today, 48 states mandate IID installation for at least some DUI offenders to maintain lawful driving privileges. Of these, 27 mandate IIDs for all offenders; seven mandate IIDs for repeat offenders only; and 21 for some combination of specific groups of DUI offenders, including repeat offenders, offenders with a blood alcohol content above a legislatively-specified level, and aggravated offenders (including those who harm someone else or who are convicted of a DUI with a child in the vehicle).

---

[7]https://www.smartstartinc.com/blog/history-ignition-interlock-device/

25.     Each state has its own ignition interlock law that determines when to install the device, how long it will need to be installed, what type of device is needed, and what monitoring authority will oversee the IID requirement (*e.g.*, probation officer, court, DMV, DOT, etc.).[8]

26.     Currently, 81 million Americans – approximately 25% – live in states that have all-offender ignition interlock laws, compared to 2 million Americans in 2006. The most recent reported data indicates that there are approximately 305,000 ignition interlock devices currently installed in the U.S.[9] The number of vehicles operating with ignition interlock devices has increased by 33% over the past four years.[10]

27.     Six ignition interlock manufacturers are currently approved by the Tennessee Ignition Interlock Program[11] to accept new customers across the State.

**B.     Intoxalock's Company History**

28.     Consumer Safety Technology, LLC. ("CST") was started in 1988, and developed its first ignition interlock system using alcohol-specific fuel cell technology

---

[8] https://www.intoxalock.com/ignition-interlock-devices/what-is-an-ignition-interlock-device/

[9] https://www.intoxalock.com/ignition-interlock-devices/statistics/

[10] https://www.globenewswire.com/news-release/2022/09/27/2523560/0/en/Ignition-Interlock-Device-Market-to-Reach-625-89-Million-by-2028-4-3-Million-Units-Sold-in-2021-SkyQuest-Technology.html

[11] Alcohol Detection Systems, Intoxalock, LifeSafer, RoadGuard Interlock, Simple Interlock, and Smart Start

-9-

in 1992. CST installed its first ignition interlock device that same year. In 2010, the Intoxalock eLERT IID was added to the company's product line to provide ignition interlock alcohol monitoring with camera, data reporting, and GPS.

29.     In 2012, CST was acquired by Clear Light Partners, LLC, and began officially doing business as "Intoxalock." In 2017, Clear Light Partners, LLC sold Intoxalock to Welsh, Carson, Anderson & Stowe. In 2019, Intoxalock became an approved IID vendor in 46 states, with customers in all 50 states. Intoxalock partners with local automotive shops and certifies them as installers of their devices. By 2022, Intoxalock's service center network exceeded 5,000. Also in 2022, Welsh, Carson, Anderson & Stowe sold CST to L Catterton.

30.     Intoxalock has annual revenues of $135 million and more than 350 employees, most of whom are located in Iowa.

**C.    Overview of Ignition Interlock Devices and How They Function**

31.     Once the IID is installed, drivers blow into the car breathalyzer mouthpiece to provide a breath sample. The device tests for breath alcohol content (BrAC) within the legal limit. If it is under the limit (typically .02), then the driver can put their keys in the ignition and start their car.

32.     Specifically, to use an IID, users must take the following steps:

■ Press the button and wait for the device to indicate it is ready.

■ Submit your breath sample using the proper method.

-10-

■ Wait for the results. If you pass, you will be able to start your vehicle.

■ If you fail, you will need to wait to re-test. Many states will automatically lock you out of your device following multiple repeated failures in a row.

■ While a failed sample means you won't be able to start your car, the device will NOT be able to turn off your car once it is running. Once your vehicle has been started, no IID is able to turn it off. If you fail a random retest, your vehicle will remain on until you remove the keys from the ignition. At this point, your device may lock you out.

33. Each state handles failed breath samples differently. While all states allow users to retest a new breath sample after a waiting period, some have a retest limit. If a user hits that limit, the user will get locked out after multiple failed attempts. Other states allow users to keep submitting samples until one passes.[12]

34. According to Intoxalock's website, once customers have successfully completed the IID requirement, they will be allowed to remove the device and reinstate their license. The process for removal varies from state to state, with some requiring approval from a monitoring authority, some requiring customers to call the state for an eligibility date or more.[13]

---

[12]https://www.intoxalock.com/ignition-interlock-devices/what-is-an-ignition-interlock-device/

[13]https://www.intoxalock.com/ignition-interlock-devices/what-is-an-ignition-interlock-device/

**D.** **Plaintiff's Experience With Intoxalock's Ignition Interlock Device**

**1.** **Tennessee Ignition Interlock Device Requirements**

35. In Tennessee, if a DUI offender wishes to continue driving during his or her license revocation, the Ignition Interlock is required for the entire length of the DUI revocation.[14] The offender will be required to complete, at minimum, a 365-day ignition interlock requirement.[15]

36. Other states' DUI and license revocation laws vary, but almost every state has adopted the requirement of mandating the use of Ignition Interlock Devices for some period before license restoration, at least for repeat offenders.

**2.** **Plaintiff Signed Five Leases with Intoxalock to Lease IIDs for Two Vehicles Over a 25-Month Period.**

37. Plaintiff pleaded guilty to DUI in a Tennessee court. After sentencing, including incarceration, fines, court costs, and a court-mandated suspension of his driving privileges, Plaintiff sought to reinstate his driver's license and regain his

---

[14]https://tnignitioninterlock.zendesk.com/hc/en-us/articles/360033548474-How-long-do-I-have-to-have-an-ignition-interlock-device-

[15]Depending on the type of DUI, the revocation length may be longer:

       DUI 1st – 1-year revocation (365 days)
       DUI 2nd - 2-year revocation (730 days)
       DUI 3rd - 6-year revocation (2190 days)
       DUI 4th - or subsequent - 8-year revocation (2920 days).

https://tnignitioninterlock.zendesk.com/hc/en-us/articles/360033548474-How-long-d o-I-have-to-have-an-ignition-interlock-device-persons who leased

-12-

driving privileges in November 2019. He contacted the Tennessee Department of Homeland Security and was advised of the necessary steps to do so.

38.     Tennessee, like most states, requires an IID as a condition of regaining driving privileges. For Plaintiff, this meant that he had to obtain a restricted license and drive a vehicle equipped with an IID for a period of two years.

39.     Plaintiff researched online all of the IID providers approved by the State of Tennessee and ultimately decided on Intoxalock, after reviewing its website, reading its representations about the costs of leasing an IID, and seeing that it had authorized and approved service and installation centers in his vicinity. That Intoxalock appeared to be the largest IID brand was one factor in Plaintiff's decision. Another factor was Intoxalock's representation that "IIDs typically cost between $60 and $90 per month."[16]

40.     On or about November 18, 2019, Plaintiff contacted Intoxalock to order an IID for installation on his Toyota Solara. He provided the company with his credit card information and was initially charged $27.50, presumably the shipping costs for the device.

41.     In a letter to Plaintiff dated December 5, 2019, Intoxalock wrote to confirm his appointment to have the IID installed on his Toyota Solara at B&M Automotive for $150.00. The letter provided Plaintiff with a few other basic instructions, charges, and pertinent dates. [Exhibit 1 – Dec. 5, 2019 Letter].

---

[16]https://www.intoxalock.com/ignition-interlock-cost/

-13-

42.     The IID was installed on Plaintiff's Toyota Solara on December 9, 2019, for an installation charge of $175.35. A few days later, Plaintiff electronically signed his first six-month lease with Intoxalock ("Dec. 2019 Lease") for the period (Dec. 9, 2019 - June 9, 2020). [Exhibit 2 – Dec. 9, 2019 Lease]. The Lease identified charges for the "Amount Due at Lease Signing" ($75.39), "Lease & Fee Payments" ($564.34/$70.56), "Other Charges" ($85.18), and "Total of Payments" ($750.12). The lease also provided for other terms, including a charge of $81.94 for a "lockout fee," that, unbeknownst to Plaintiff, was more than three times the amount Tennessee permitted Intoxalock to charge for "lockout fees."

43.     This lease, and four subsequent leases signed by Plaintiff, were relatively uniform, with fill-in-the-blank spaces for fees or charges. For example, the June 2020 lease set out the charges as follows:

| Amount Due at Lease Signing | Lease & Fee Payments | Other Charges (In addition to Lease and Fee payments) | Total of Payments (The amount you will have paid by the end of the Lease, including sales tax and state mandated fees, if applicable) |
|---|---|---|---|
| First Lease payment (includes sales tax) $46.97<br><br>Device Fee $ 0.00<br><br>Delivery Fee $0.00<br>Setup Fee $30.04<br><br>Device Protection Fee $ 5.46<br>_____<br>$82.47 | Your Lease payment and device protection fees will be withdrawn Bi-weekly on every other Wednesday of each month. Your first Lease payment of $46.97 is due at Lease signing on 3/10/2021 followed by 13 payments of $46.97.<br>The total of your monthly Lease payments is $657.58 (includes sales tax)<br>Your first device protection fee of $5.46 is due at Lease signing on 3/10/2021 followed by 13 payments of $5.46. The total of your device protection plan fees are $76.44 (includes sales tax). | Data processing fee ($3.00 per time, estimated total) $19.68<br><br>Shipping and Handling $0.00<br><br>Administrative Closing Fee $65.54<br><br>State Fee $0.00<br><br>TN ($12.50 Yearly)<br>_____<br>Total $85.22 | Total $849.28 |

-14-

**Purchase Option at the end of Lease Term.**

You do not have the option to purchase the leased property at the end of the lease term.

**Other Important Terms.**

See your lease document for additional information on early termination, maintenance responsibilities, express shipping fees, late and default charges, lockout and logfull charges, vehicle switches, repair fees, and any security interest, if applicable.

| ARS Return Fee | $0.00 | Expedited Shipping Fee Starting At | $19.67 |
|---|---|---|---|
| No Show Fee | $50.00 | Late Payment Charge | $4.99, subject to any state restrictions |
| Lockout Fee | $54.63 | Vehicle Switch Fee | $32.78 |
| Exhange Fee | $0.00 | Labor Per Hour | $54.63 |
| Early Cancellation Fee | $218.50 | Device Fee | $0.00 |
| Initial Replacement Fee | $27.31 | Chargeback Fee | The lesser of $30.00, or the maximum amount allowed by state law |
| Data Log Fee | $25.00 | Return Check Fee | $15.00 |
| Reset Calibration Fee | $27.31 | | |

See your Lease terms below for an explanation of the fees charged by the service center (installation fee, removal fee, calibration fee, log full fee, and vehicle switch fee).

44.     Plaintiff executed a second six-month lease on July 15, 2020, covering the period from June 9, 2020 to December 9, 2020. [Exhibit 3 – July 15, 2020 Lease]. This lease included most of the same charges, with a reduced amount for "Other Charges" ($73.06). The "lockout fee" also changed from $81.94 to $54.63.

45.     Unfortunately, Plaintiff's Toyota Solara stopped running in December 2020, and Plaintiff was eventually forced to switch vehicles (after he had purchased another one).[17]

--------

[17]Under Tennessee law, Plaintiff was also permitted to toll the period of his two-year requirement during the period in which he lacked a vehicle (the period from December 15, 2020 to  March 15, 2021).

-15-

46.     After obtaining another vehicle – a 2003 Infiniti M45 – and being compelled to pay shipping costs for another IID, pay another "setup fee" for leasing the second IID, and pay a second installation fee of approximately $175.00 for the device, Plaintiff executed a third six-month lease on March 10, 2021, covering the period of March 10, 2021 to September 10, 2021. [Exhibit 4 – March 19, 2021 Lease]. This lease reflected an increase in several charges, including the monthly lease payment (from $40.31 to $46.97) and the charge for a "Device Protection Plan" (from $70.56 to $76.44).[18] The already excessive "lockout fee" stayed the same, at $54.63.

47.     Plaintiff executed a fourth six-month lease on September 10, 2021, covering the period of September 10, 2021 to March 10, 2022. Upon information and belief, this lease saw most of the charges remain the same as the most recent lease.[19] In addition to the amount due at lease signing ($75.39), lease and fee payments, and other charges, the lease required Plaintiff to pay $46.97 as a bi-weekly lease payment and $5.46 as a bi-weekly Device Protection Fee, totaling $52.43, or $104.86 per month.

---

[18]Plaintiff does not recall requesting a "Device Protection Plan" from Intoxalock in any amount, but he believes the charge may have been automatically inserted into each of the five leases and made a part of his bi-weekly payments. The fee was never explained to Plaintiff, and none of the leases explain the necessity or requirement of such a fee.

[19]Plaintiff has been unable to locate a copy of the fourth lease (the September 10, 2021 lease) or the fifth lease (March 10, 2022) and cannot access those leases on his now-closed Intoxalock account, but Intoxalock possesses copies of both the fourth and fifth leases.

In addition, Plaintiff was also charged $3.28 approximately every month for a Data Processing Fee. Like the other leases, it was chock-full of extra charges: lockout fees ($54.63), device replacement fees ($27.31), and vehicle switch fees ($32.78).[20]

48.    State requirements ultimately forced Plaintiff to sign yet a fifth six-month lease on March 10, 2022, notwithstanding the fact he would become eligible to have the device removed in April 2022, long before that final lease would expire.[21]

49.    Plaintiff was notified on March 31, 2022 that Intoxalock had completed a 120-day review on his account and had reported to Tennessee Department of Public Safety ("TN DPS") that he had been "violation free" for 120 days, a prerequisite before device removal could be approved by the state and a removal appointment set up.

50.    Therefore, for twenty-five (25) months, in order to start his vehicle, Plaintiff had to prove his sobriety by blowing into the Ignition Interlock Device. If any alcohol at any level had been detected, the vehicle would not start. But to keep driving, he had to provide additional breath samples to show he hadn't been drinking on the

---

[20]In addition to the lease charges, Plaintiff had to pay $17.54 monthly to a service center for calibration for a period of 25 months, totaling $438.50, as required by law. *See* Tenn. Comp. R. & Regs., Ch. 1340-03-06-.10(1) ("Servicing, inspection, and monitoring of each ignition interlock device shall occur thirty (30) days after the initial installation and at least every thirty (30) days thereafter").

[21]Total Scheduled Lease Charges:

| | |
|---|---|
| Dec. 2019 | $750.12 |
| June 2020 | $737.00 |
| March 2021 | $849.28 |
| September 2021 | $849.28* estimate |
| March 10, 2022 | $849.28* estimate |
| | _____ |
| Total | $3,269.96 |

road or to avoid having a sober passenger blow into the device to get the car started. Those checks, known in the industry as rolling retests, occur at random. They require the driver to lift a hand off the wheel, pick up the device and blow – hard – into its mouthpiece for several seconds. If the driver fails or doesn't comply, the car goes into panic mode: Its headlights flash and its horn honks until the driver turns off the engine.[22]

51.    For 25 months, and hundreds of tests, Plaintiff never tested positive for alcohol and was never "locked out" of his vehicle for that reason.

### 3.    Intoxalock Misrepresented the Typical Monthly Costs of IIDs.

52.    Unfortunately, Plaintiff, like other Class members, inevitably discovered that Intoxalock's representation that "IIDs typically cost between $60 and $90 per month" was substantially false and misleading. For instance, in his initial lease in December 2019, Plaintiff had to pay $93.98 per month in fixed monthly costs. However, by the time Plaintiff had signed his third lease on or about March 10, 2021, his fixed

---

[22]A publicized case in Texas in 2017 concerned a driver who had just successfully blown into the device when he dropped it to the floor. When he leaned down to retrieve the device, stating to police that he wanted to have the device handy when it prompted him again, he took his eyes off the road for a few seconds. This was enough time for his pickup truck to collide with a car backing up from a driveway, killing its occupant.  He is clearly responsible for the wrongful death in that collision.

It takes about 4-seconds to blow into the device when prompted. It does require you to blow hard. One driver reportedly blew so hard that he passed out and crashed into a tree, nearly severing his hand. Other drivers were so focused on providing a sample that they veered into the adjoining traffic lane or crossed the median into oncoming traffic.

-18-

monthly costs were $108.14.[23] This amount was fully 80% ($48.14) higher than Intoxalock's stated minimum "typical" costs, and 20% ($18.14) higher than Intoxalock's stated maximum "typical" costs.

53.     Even worse, the "total of payments" ($750.12) in the initial lease actually came out to a monthly cost of $125.02, while the "total of payments" ($849.28) in the third lease increased to a monthly cost of $141.55, substantially more than the maximum "typical" costs commonly represented by Intoxalock.

54.     Leasing a IID is expensive, even when considering only the amount of the so-called "total payments" identified by Intoxalock. For example, one of Plaintiff's leases disclosed that his costs would be $849.28 for a six-month period. But that amount did not include any lockout fees ($54.63 each), replacement fees ($27.31 each), or reset calibration fees ($27.31 each). Nor did it include any costs charged to Plaintiff if he wound up having to change cars during the lease, *e.g.*, another "setup fee" of $30.04 and a "vehicle switch fee" of $32.78. It certainly did not include the installation costs ($175.00) or the 25 monthly $17.34 calibration fees, both of which were paid to a service center (for both vehicles).

55.     All together, Plaintiff paid approximately $3,500 to Intoxalock alone, and another $430.00 or so to Intoxalock's service center, bring the total to nearly $4,000.00, not including what he had to pay the state to reinstate his license. But even this was

---

[23]This total is reached by adding together the bi-weekly $46.97 lease charge, the bi-weekly $5.46 device protection fee, and the $3.28 data processing fee.

not the end of it, as the IID constantly drained Plaintiff's car battery, causing him to have to purchase no fewer than five new car batteries, at a cost of over $1,072.98, taking his total out-of-pocket costs to more than $5,000.00.

### 4. Intoxalock Misrepresented That IIDs Would Not Damage Vehicles

56.     As Plaintiff was researching IID providers, he also read the following representation on Intoxalock's website:

> "IIDs that are installed correctly should never do any damage to your vehicle. This is what it is important to choose an interlock provider that thoroughly trains their installers. At Intoxalock, each installer is trained and certified, and their work is held to high standards to protect your vehicle."[24]

57.     Yet, Intoxalock's IID's *do cause damage* to the host vehicle in which they are installed. Specifically, Intoxalock IIDs are "powered on" for twenty-four (24) hours a day, seven (7) days a week, and constantly drain and damage the car battery.

58.     For example, over the course of the twenty-five (25) months Plaintiff contracted with Intoxalock, he discovered that the IID drained his car battery so rapidly that he frequently had to arrange to jump-start the battery, having to do so no fewer than twenty (20) times.

---

[24]https://www.intoxalock.com/ignition-interlock-devices/faq/

-20-

59. Whenever Plaintiff contacted Intoxalock about the battery issue, Intoxalock representatives were largely unhelpful, suggesting that he put the device in "sleep mode" overnight while not driving. Although Plaintiff did as suggested, even in "sleep mode" the IID drained his car battery and/or destroyed one battery after another.

60. In all, the Intoxalock IID wound up destroying at least five car batteries, such that Plaintiff had to replace them and purchase brand new batteries at a cost of approximately $1,072.98.

61. As time passed and Plaintiff repeatedly had to jump-start his car battery or purchase new batteries to replace ruined ones, Plaintiff discovered that the only meaningful "fix" for the problem was for him to obtain a battery charger and hook his car battery up to the charger overnight, every night. At least this stopped the battery from draining completely and triggering a lockout and expensive lockout fees.

**E. Intoxalock's Breaches, Overcharges, and Excessive Fees**

62. Intoxalock is obligated by every state's laws not to violate the terms of its leases, not to overcharge consumers, and not to charge excessive fees.

63. In Tennessee, for example, Intoxalock must comply with Tennessee regulations restricting the amount of fees it assesses. *See* Tenn. Comp. R. & Regs. R. 1340-03-06.-05 ("The service center and manufacturer shall comply with all applicable state laws, administrative rules, and regulations.").

64. Like other states, Tennessee law explicitly requires fees charged by IID manufacturers, like Intoxalock, to be at reasonable rates. *See* Tenn. Comp. R. & Regs.

R. 1340-03-06.-15 ("The fees for leasing, buying, monitoring, servicing, installing, and removing the BAllD shall be at a reasonable rate set by the manufacturer").[25] Certain fees are explicitly capped. For instance, under Tennessee law, "manufacturers may charge reasonable and customary fees, not to exceed a total of twenty-five dollars ($25.00), for a temporary lockout code." Tenn. Comp. R. & Regs. R. 1340-03-06.-15.[26]

65. Yet, several of Intoxalock's fees are set at unreasonable rates. The "lockout fee," restricted by Tennessee law to $25.00, is $54.63, more than double the amount permitted.

*"Setup Fees"*

66. Intoxalock charged Plaintiff and Class members a "setup fee" of $30.04 every time they signed a lease (for Plaintiff, that was five different "setup fees" of $30.04, or $150.20). Yet, Intoxalock says that it requires the "setup fee" for "installation" of the IID. But Plaintiff and other Class members separately paid authorized service centers hefty installation fees of approximately $175.00 each time they installed IIDs. Plaintiff, who had to switch vehicles, paid that sum twice.

67. Although Intoxalock states in the lease that "Each service center sets its own installation fee" and that it does not "receive any part of the installation fee," the fact is that the "set up fee," paid directly to Intoxalock "for the installation of the

---

[25]Although this provision has been amended since the rules were first adopted in 2013, every applicable version of these regulations have required the fees for leasing, buying, monitoring, servicing, installing, and removing the llD "to be at a reasonable rate set by the manufacturer."

[26]Prior versions of this provision have likewise required that lockout fees assessed by the IID manufacturer not exceed $25.00.

-22-

Device," is unreasonable, redundant, and superfluous, as Intoxalock provides no installation service for IIDs.

*Vehicle Switch Fees*

68.     Similarly, Intoxalock also charged Plaintiff and other Class members a "vehicle switch fee" of $32.78 whenever they change vehicles during the lease. But other than editing the account and changing the form lease to reflect a simple change in vehicles, Intoxalock provided nothing of value for that fee.

69.     Worse still, switching vehicles meant that Plaintiff and other Class members would have to pay Intoxalock shipping costs for another IID, get the IID out of their original vehicle removed for yet another fee, get the new IID installed for yet another installation fee, pay Intoxalock yet another redundant "setup fee," and then pay a "vehicle switch fee" for no additional consideration whatsoever.

*Data Processing Fees*

70.     Intoxalock also charged Plaintiff and Class members a "Data Processing Fee" of approximately $3.28. This fee purportedly covered Intoxalock's data retrieval of information from Plaintiff's IID and car battery. Intoxalock does "real time data reporting providing near real-time communication of Device data log records pertaining to [a user's] account (including, but not limited to photos, video and GPS information) to CST's server and transmitted to CST's website.

71.     Intoxalock uses this data to, among other things, remotely monitor the IID, monitor whether an IID has been tampered with, and monitor the power level of the IID and the host car battery.

-23-

72. Yet, although the real-time data retrieval permits Intoxalock to monitor the power level of the IID and its host car battery, such that it knows whenever the power is draining from the car battery to levels sufficient to trigger a "lockout," Intoxalock does nothing to alert Plaintiff or other Class members that their car batteries are draining to the "lockout" level.

73. Rather, Intoxalock ignores the power-drain and permits the car's battery power to drain in order to trigger a "lockout" – and hefty lockout fees. This inaction, for all practical purposes, perpetuates a scheme by Intoxalock to create unnecessary lockouts, and unfairly penalizes Plaintiff and Class members, who are then forced to pay avoidable lockout fees or not drive at all.[27]

*Lockout Fees*

74. IIDs are designed to lock a user out when he or she fails the breathalyzer test. However, the device can lock users out for reasons other than failing the breathalyzer test, including reasons for which users have no control. Worse still, lockouts – and hefty lockout fees – result even when users have followed every protocol by the letter.

---

[27]Obviously, if Plaintiff and Class members were alerted that their car batteries had drained and required charging to avoid a lockout and lockout fees, they would jump off the battery or otherwise charge it. Plaintiff's car battery drained at least four times and triggered a lockout, requiring him to pay four $54.63 lockout fees to Intoxalock each time. If he had been alerted, none of those charges would have occurred.

-24-

75. The leases provide that:

> "[i]t is possible that a Device will go into a lockout mode if any of the conditions set forth in the Intoxalock User's Manual occur. The display on the Device will warn you if the Device has gone into lockout. ***Should you cause the Device to go into a lockout mode***, you will be required to email us at Help@Intoxalock.com. ***A lockout fee set forth on page 1 of this Lease is payable to us and will be assessed for each occurrence*** . . . ."

*See* Lease, at ¶ 7 (emphasis added).

76. In the twenty-five (25) months Plaintiff had the IID on his vehicles, he never once blew "hot." That is, he never once registered positive for alcohol. Nevertheless, Plaintiff still experienced no fewer than four "lockouts," each requiring him to pay a "lockout fee" of $54.63. These charges, totaling $218.52, occurred on July 20, 2020; August 17, 2020; October 26, 2020; and December 8, 2021.

77. This occurred notwithstanding the fact that *Plaintiff followed every protocol to the letter*, including monthly calibrations, following the instructions not to use the IID within 15 minutes of eating or drinking, and avoiding certain items that might lead to a positive breathalyzer test.

78. IIDs depend on power from the car's electrical system. The device is powered on twenty four hours a day, seven days a week, constantly sending data to Intoxalock, while constantly drawing power from the car's battery.[28]

---

[28]Also, although the device is equipped with an internal warmer for its electronics that starts if the device sensor senses cold temperatures, the warmer also draws power from the vehicle battery.

-25-

79.     Intoxalock warns that IIDs must receive a constant 12-volt power supply in order to work properly. A car's battery is a 12-volt lead-acid system which allows the car's starter and voltage regulator to act in unison. Most car models require at least 9 volts (about 40 per cent charge) of electricity to start, although some with more advanced electrical systems may require up to 11 or 12 volts.[29] A loss of power to the IID or even a drop in voltage may be interpreted by Intoxalock as an attempt at disconnection, circumvention, or "tampering," all of which are serious offenses which may result in additional license revocations and potential criminal charges.

80.     Plaintiff was never informed by Intoxalock before having the IID installed that the IID required so much power that it would ruin or destroy a car battery overnight, and, as Plaintiff would inevitably discover, would ruin even a brand new, top-of-the-line car battery. In fact, Intoxalock represented the IID would not damage cars in which they were properly installed.

81.     As noted, Plaintiff was assessed at least four "lockout fees" after his car battery drained so rapidly overnight that it triggered a "lockout." Because of the data retrieved by Intoxalock from Plaintiff's IID and car battery, however, Intoxalock knew, or should have known, that Plaintiff never "caused the Device to go into a lockout mode" on any of the four assessed lockouts. Rather, it was the result of slow battery drain caused by the IID itself, easily seen from the data retrieved in real time from the IID and Plaintiff's car battery.

---

[29]*See* https://www.electronicshub.org/how-many-volts-to-start-a-car/#:~:text=
A%20car's%20battery%20is%20a,to%2011%20or%2012%20volts.

-26-

82.     The data retrieval process not only allows Intoxalock to monitor every user's IID, but it also allows Intoxalock to monitor the car's battery power and voltage – over a period of time or at any given time. In fact, Plaintiff paid for this data processing service every month via a $3.28 "Data Processing Fee."[30] This data is instantly available to Intoxalock, not only enabling the company to determine whether an IID loses power or whether there has been a drop in voltage, but also whether an IID or car battery has been disconnected or tampered with or whether power has merely drained from the battery over time, *e.g.*, overnight.

83.     In December 2019, within the first few days after having the IID installed, Plaintiff began noticing that his car battery was draining rapidly overnight. This was unusual, as he had never experienced a problem with the battery in his Toyota Solara. He called Intoxalock, and a representative eventually suggested that he put the IID into "sleep mode," which allegedly might keep it from draining as much voltage from the car battery. Although Plaintiff tried this "fix," it made no significant difference in the power drain.

84.     Plaintiff ultimately learned from a Intoxalock representative that the car battery has to have virtually no charge in order to trigger a "lockout" and require a

---

[30]Intoxalock leases provide that an estimated $3.00 Data Processing Fee is charged to the user "for the downloading and processing of the data log." Plaintiff was charged a fee of $3.28 approximately once a month ($82.00 over the course of the leases).

-27-

lockout fee to unlock the IID. In other words, as long as Intoxalock is able to monitor data coming from the car's battery and that data shows a battery charge, there would be no "lockout" and Plaintiff did not have to pay a "lockout fee."

85.     Once all power was lost and lockout mode was triggered, Plaintiff and other Class members were forced to call Intoxalock or connect to the "Intoxalock App" and agree to pay the "lockout fee" to "unlock" the IID. Intoxalock had Plaintiff's credit card information on file. Once he authorized the payment, the IID instantly unlocked. This happened to Plaintiff on at least four occasions.

86.     On one occasion in the first few weeks of having the IID, with his battery constantly draining rapidly overnight, Plaintiff contacted Intoxalock and was surprisingly informed by a representative that Intoxalock (and she) could monitor his car battery data, *i.e.*, voltage, remotely and in real time, and monitor whether – and exactly how much – it had drained over time, *i.e.*, overnight. In other words, not only did Intoxalock have the data from Plaintiff's car battery to determine that he had not, in fact, "tampered" with the IID or his car battery, but Intoxalock could also warn Plaintiff whenever his car battery was about to reach a voltage level low enough to trigger a lockout. This, of course, would allow Plaintiff to avoid the pricey "lockout fee" by immediately charging his car battery. But such a warning – feasible or not – also meant that Intoxalock would lose the lockout fee, affecting profits, and it was not going to permit that to happen, with Plaintiff or any Class member.

87.     Throughout Plaintiff's lease period, Intoxalock constantly received data from his IID and car battery, and knew that his battery was draining slowly overnight.

-28-

The data retrieved also revealed that Intoxalock knew that Plaintiff had not "tampered" with the IID or car battery, and that no "lockout" – or lockout fee – was ever justified.

88.     Nevertheless, on at least four occasions, Plaintiff's car battery completely drained, and Intoxalock locked him out and charged him "lockout" fees of $54.63, totaling at least $218.52.

89.     Between installation of Plaintiff's IID in December 2019 and the date he had the IID removed in April 2022, Plaintiff had to "jump-start" his car battery no fewer than twenty (20) times after the IID had drained the battery overnight. While enough of a charge remained on most occasions to prevent a lockout and a "lockout fee," Plaintiff still had to purchase five new batteries at a total cost of approximately $1,072.98.

90.     After all this, Plaintiff wound up getting a car battery charger and kept the charger attached to his car battery every night, all night long, to make certain that the battery did not drain to trigger yet another lockout.

### F.     Online Consumer Complaints Confirm that the IIDs Damage Car Batteries and Unscrupulous "Lockouts" and "Lockout Fees."

91.     Online complaint boards are chock-full of complaints against Intoxalock because the IID constantly drains car batteries. For instance, a customer reported:

> "It constantly drains my battery to the point of needing to be jumped," even after following Intoxalock's instructions to the letter. So, the "battery is killed, I get a lockout message,

-29-

and I get to go and spend $100 to have the lockout removed and to have the unit serviced at my local dealer." "I have replaced 2 batteries, because they were drained.[31]

92.     Another customer made a similar complaint:

"I had several issues with my car after the Intoxalock device was installed in my car. My car would not start and the battery would not charge. I had to get a new battery from Pepboys."[32]

93.     Yet another customer complained:

"Throughout the duration of having my interlock, I've had many issues with my car dying. I've called many times to troubleshoot and ended up just replacing my car battery . . . The troubleshooting (unplugging the device, messing with my car battery) and subsequent unplugging has caused me to go into multiple lockouts . . . . Whenever I call to dispute a lockout charge, I'm told I need to speak to either admin or invoices, so I've sent multiple emails and called SO many times. I keep getting pushed around or told someone else said the charges were valid."[33]

94.     On April 20, 2021, a customer posted this online complaint:

"I have repeatedly reported that the device was draining my battery. I have replaced the battery twice with heavy duty batteries and still they are being drained. Now the device locks me out for a few minutes. Gives an error code of service required then says ready for me to blow. When in low it starts. I called intoxalock and the tech says remove the negative battery cable for 15 minutes. I did that. Same result. When I blew into the device the truck started. I

---

[31]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=2

[32]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=3

[33]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=2

drove it. This morning same thing. I call intoxalock and they said the error was because I disconnected the battery and that is a violation."

95.     All of this was and is preventable. Many lockouts – especially lockouts due to insufficient battery power – are unreasonable, as Intoxalock possesses the means, knowledge, and ability to determine whether a lockout fee is actually warranted in the first place, rather than assuming power was lost via nefarious means, *e.g.*, tampering.

*Other "Lockout" Complaints*

96.     Online complaints also target Intoxalock's unscrupulous practice of assessing "lockouts": "Literally nothing but a scam so many fake lockout charges."[34] One customer was charged a "lockout" fee when the mechanic failed to turn his ignition off and the Intoxalock device prompted for a retest. Despite the cabin camera that recorded exactly what had occurred, the customer was charged a lockout fee.[35]

97.     Another customer had this complaint about repeated lockouts:

"Started up car, then waited 4 minutes to blow again. Was about to get to the store when I had to blow for a 3rd time. Then, I went into the store within 3 mins of blowing last. Came out and I have the same violation again. Lockout. No clue why it's happening."[36]

_____

[34]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=3

[35]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=2

[36]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=4

-31-

98. Yet another customer reported:

> "since November of 2022 the device in my car has given me 9 false violation 11s, the device does not work right and I've called customer service every time and they always say the same thing . . . I'm forced to pay this violations fee upfront ($89.00) each time as well as $30.00 to a service center to reset my device. . . . if you don't pay them upfront your car is put into permanent lockout and now your car will NOT start at all and you have to have it towed to a service center."[37]

99. Part of the Intoxalock installation is a cabin camera that allows Intoxalock to monitor a customer's actions inside the cabin, especially behind the steering wheel. Yet, even video evidence of no wrongdoing is sometimes insufficient to thwart Intoxalock from assessing a lockout and hefty lockout fees:

> "two different times this last couple weeks [] my device keeps going into lockout and am being charged a penalty of $75. The first time is because my battery died and I put in a work order through my app notifying them I'd be jumping my car. This prevents the lockout fee from occuring but this time they decided to penalize me. When I've attempted to contact their customer service number I've been told multiple things and no assistance is given. I've been hung up on and refused the right to speak with a supervisor. Was also told this was a glitch and this would be resolved and I wouldn't be penalized. Now today I have yet another lockout, contacted customer support and was told my device was unplugged while the car was on. There is a camera and gps on the Intoxalock and they can see the car wasn't moved not to mention they know I need to remove the device so my battery doesn't die and I need yet another jump to get penalized yet again for completing this service just as what happened the week before. I called 3 xs today and was refused a supervisor, spoke with a man I was respectful to

---

[37]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technology-llc-0664-5025450/complaints?page=4

but asked to speak with a supervisor and he refused and told me to call back on Monday. . . . This is a horrible situation where they are taking advantage of people who have been required to install these devices in order to drive. I have no choice but to keep giving them money for situations that aren't worthy of penalties or am not allowed to drive. How can this be acceptable to do to any human????"[38]

100.    Intoxalock has seen and heard these complaints. In response to such complaints, Interlock's representatives offer explanations like the following one, responding to a Better Business Bureau complaint against the company: "We recognize that obtaining & managing an interlock can be quite a confusing process."[39]

101.    Plaintiff and Class members do not challenge the payments to Intoxalock to the extent they were reasonable, necessary, and required by law. Indeed, they rightly concede their obligations to use the Ignition Interlock Devices for the period prescribed by law and to pay all amounts lawfully prescribed therefor. Rather, they challenge only those overcharges and excessive fees taxed to them by Intoxalock in violation of their leases, in violation of Iowa's Consumer Fraud Act (or alternatively, in violation of the Tennessee Consumer Protection Act), fraudulently, or by unjust enrichment. They also seek damages for the destruction of car batteries attributable to use of the IID and for out-of-pocket costs to purchase new batteries.

---

[38]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=5

[39]https://www.bbb.org/us/ia/urbandale/profile/drug-testing/consumer-safety-technolo gy-llc-0664-5025450/complaints?page=43

-33-

### G. Plaintiff and the Class Have Been Injured By Intoxalock's Actions.

102.  Intoxalock's conduct has imposed significant costs upon Plaintiff and Class members.

103.  Plaintiff was charged five separate "setup fees" from Intoxalock "for installation," totaling $150.20, although he had already paid the service center over $175 for installation. He was charged lockout fees of $54.63 on four occasions, totaling $218.52, although his actions were never once the actual cause of the lockouts, which occurred because his car batteries had been drained overnight by the IID. Plaintiff also had to pay a "vehicle switch fee" even though Intoxalock simultaneously charged him a new "setup fee" for signing a new lease when he switched vehicles and incurred no cost or burden to justify the fee. And he paid a monthly $3.28 data processing fee, totaling $82.00, to retrieve data from his IID and car battery; yet, never once did Intoxalock use that data to alert him that his battery was dying to prevent him from repeatedly incurring lockout fees.

104.  In addition to incurring these unfair or deceptive, unlawful, unreasonable, and/or excessive charges, Plaintiff also made dozens of telephone calls to Intoxalock to report the constant drain on his car batteries that was not disclosed to him, or to report having to jump-start batteries day after day and one battery after another. He spent countless hours on the phone with Intoxalock customer service representatives, complaining about battery drain and being unfairly charged lockout fees.

-34-

105. Plaintiff has suffered damages and ascertainable losses as a consequence of Intoxalock's misconduct. Other Class members have similarly suffered damages and ascertainable losses as a consequence of Intoxalock's misconduct, as alleged herein.

## V. APPLYING IOWA SUBSTANTIVE LAW

106. Iowa's Consumer Fraud Act applies to the proposed Class, as defined herein, because Intoxalock is an Iowa-based limited liability company and Intoxalock's unfair or deceptive actions or omissions and its scheme to overcharge Plaintiff and Class members hundreds of dollars were hatched and orchestrated in Iowa.

107. Iowa's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution. Iowa has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of Iowa state law is not arbitrary or unfair.

108. Intoxalock's headquarters and principal place of business are located in Iowa. Intoxalock also owns property, employs hundreds of employees, and conducts substantial business in Iowa. Therefore, Illinois has an interest in regulating Intoxalock's conduct under its laws. Intoxalock's decision to reside in Iowa, place its headquarters there, and avail itself of Iowa's laws renders the application of Iowa law to the claims made herein constitutionally permissible.

109. A substantial number of members of the Class also reside in Iowa and leased and re-leased Ignition Interlock Devices there.

-35-

110. Iowa is also the state from which Intoxalock's alleged misconduct emanated.

111. This conduct similarly injured and affected Plaintiff and Class members. For instance, upon information and belief, Intoxalock's marketing and engineering efforts relating to the development and marketing of Ignition Interlock Devices were undertaken and orchestrated from its headquarters in Iowa.

112. Application of Iowa's laws to the Class is also appropriate under Iowa's choice-of-law rules because Iowa has significant contacts to the claims of Plaintiff and the Class, and Iowa has a greater interest in applying its laws than any other interested state.

113. Although the Plaintiff resides in Tennessee, Intoxalock's principal place of business is in Iowa. IIDs were, upon information and belief, designed, created, and manufactured in Iowa. They were also shipped to Plaintiff and Class members wherever they resided from Iowa.

114. In addition to leasing IIDs that were designed, created, marketed, and shipped to Plaintiff and Class members from Iowa, Plaintiff and Class members repeatedly called Intoxalock's offices in Iowa about the IID and to discuss lease problems with customer service representatives based in Iowa. The lease forms were drafted by Intoxalock in Iowa. Plaintiff and Class members also directed all lease and other payments – via credit card or otherwise – to Intoxalock in Iowa.

-36-

115. In addition to calling Intoxalock in Iowa, Plaintiff also repeatedly sent emails to Intoxalock's customer service representatives in Iowa, questioning or complaining about problems with the IID and/or leases.

116. All of these communications were directed to Iowa and any and all responding or return communications by Intoxalock were directed from Iowa to Plaintiff and Class members where they reside as well.

117. In the alternative, the law of the home state of Plaintiff (Tennessee) and each Class member should apply to his or her claim.

## VI. CLASS ACTION ALLEGATIONS

118. ***Class Period and Definition.*** Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(a) and (b) on behalf of the following proposed Class:

> All persons who have leased Intoxalock Ignition Interlock Devices ("IIDs") in the United States since December 8, 2013, and until the trial of this action.

119. Alternatively, Plaintiff seeks certification of an appropriately ascertainable and geographically suitable class of persons who have leased Intoxalock Ignition Interlock Devices, *e.g.*, in the State of Tennessee, since December 8, 2017.

120. Excluded from the Class are Intoxalock's agents and employees, including authoried installers or service center employees. Also excluded from the Class are persons who assert claims for personal injury, wrongful death, and/or emotional distress.

-37-

121.    Plaintiff reserves the right to expand the Class definition to seek recovery on behalf of additional persons as warranted, as facts are learned in further investigation and discovery.

122.    ***Ascertainability.*** Class members are readily ascertainable from the information and records in the possession, custody, or control of Intoxalock. The proposed Class is ascertainable because it is defined by reference to objective criteria. In addition, the proposed Class is identifiable in that, upon information and belief, the names and addresses of all members of the proposed Class can be identified in business records maintained by Intoxalock and/or the records of Intoxalock's agents.

123.    ***Numerosity.*** The proposed Class satisfies Rule 23(a)(1) because, upon information and belief, it is so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Plaintiff at this time and can only be determined through appropriate discovery. Plaintiff reasonably estimates that Intoxalock has leased at least tens of thousands of IID's to consumers across the country and thousands to consumers in Tennessee. Therefore, the Class is sufficiently numerous such that individual joinder of all members is impractical, as required by Fed. R. Civ. P. 23(a)(1).

124.    ***Commonality.*** There are common questions of law and fact that predominate over any questions affecting only the individual members of the Class, as required by Fed. R. Civ. P. 23(a)(2) and Fed. R. Civ. P. 23(b)(3). The wrongs alleged against Intoxalock are common to each and every member of the proposed Class. These

-38-

common questions do not vary from one Class member to another and may be determined without reference to the individual circumstances of any Class member. The common questions include, but are not limited to, the following:

   a.   Whether the leases signed by Plaintiff and Class members are uniform;

   b.   Whether Intoxalock breached its leases with Plaintiff and Class members by charging unreasonable or excessive fees;

   c.   Whether Intoxalock omitted and/or concealed material facts from Plaintiff and the Class;

   d.   Whether Intoxalock made false and/or misleading statements to Plaintiff and the Class;

   e.   Whether Intoxalock engaged in unfair or deceptive acts or practices in connection with leasing the IIDs to Plaintiff and the Class;

   f.   Whether Intoxalock has been unjustly enriched through the misconduct described in this Complaint;

   g.   Whether Plaintiff and the Class have suffered damages as a result of Intoxalock's wrongful conduct and, if so, the appropriate amount thereof; and

   h.   Whether Plaintiff and the Class are entitled to equitable and/or other relief and, if so, the nature of such relief.

125.   ***Typicality.*** Plaintiff's claims are typical of the claims of other Class members, as required by Fed. R. Civ. P. 23(a)(3). To be sure, Plaintiff's claims and those of the members of the Class originate from the same standardized lease form utilized by Intoxalock and the same generalized actions or omissions by Intoxalock. Plaintiff possesses the same interests and has suffered the same injuries as each

-39-

member of the proposed Class. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the Class members and are based on the same legal theories. In addition, Intoxalock's defenses are and will be typical of and the same or identical for each member of the Class and will be based on the same legal and factual theories. There are no unique defenses to any of the Class members' claims.

126.    ***Adequacy.*** Plaintiff will fairly and adequately represent and protect the interests of Class members, and has retained counsel with substantial experience in the prosecution of class actions, as required by Fed. R. Civ. P. 23(a)(4). Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests adverse to the Class they seek to represent.

127.    ***Superiority.*** A class action is superior to other available method for the fair and efficient adjudication of this controversy, under Fed. R. Civ. P. 23(b)(3). Individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable, as the damages suffered by individual Class members are relatively small. Class members thus have no interest in individually controlling the prosecution of separate claims against Intoxalock.

128.    Individualized litigation also presents the potential for inconsistent or contradictory judgments. Absent a class action, most Class members would find the cost of litigating their claims prohibitive, and would thus have no effective access to the

courts or remedy at law. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII. CAUSES OF ACTION

## COUNT ONE

## BREACH OF CONTRACT

129.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraph Numbers 1-128 above, as if fully set forth in this Count, to the extent not inconsistent with the claims asserted in this Count.

130.    Intoxalock uses a uniform pre-printed form contract – which it drafted – to enter into leases with Plaintiff and other Class members for Ignition Interlock Devices ("IIDs"). These form contracts establish terms – commonly for a six-month period – and a schedule of fees to be charged each lessee. While the lease payment and/or certain specific fees may change from one lease period to the next, these leases are substantially uniform in all relevant aspects, as are their relevant terms.

131.    Plaintiff and each member of the Class entered into one or more Ignition Interlock Device written lease agreements with Intoxalock during the Class Period.

132.    Plaintiff and each member of the Class performed their lawful lease obligations.

-41-

133. Intoxalock has breached these leases and violated its duty of good faith and fair dealing which exists in each contract by, among other reasons, assessing unnecessary, unreasonable, or otherwise unlawful charges against Plaintiff and Class members for setup fees, vehicle switch fees, data processing fees, and lockout fees.

134. By charging Plaintiff and each member of the Class duplicate, redundant, or unnecessary fees, and/or fees set at unreasonable rates or rates contrary to state law, fees for which no reciprocal service was provided, including setup fees, vehicle switch fees, data processing fee, and lockout fees; and by charging Plaintiff and Class members sham or bad faith lockout fees, Intoxalock has breached the written leases at issue.

135. Plaintiff and each member of the Class has been directly and proximately harmed by Intoxalock's breach of contract in that each paid more for fees, setup fees, vehicle switch fees, data processing fees, and lockout fees than was reasonable or permitted by law.

136. Intoxalock failed to perform on the leases with Plaintiff and Class members in good faith. Intoxalock acted arbitrarily and capriciously, charging duplicate, redundant, or unnecessary fees, unreasonable and superfluous fees, and ignoring state law limits on fees, including lockout fees, that it could lawfully charge Plaintiff and other Class members.

137. Intoxalock engages in a bad-faith scheme or pattern of using sham, arbitrary, unnecessary, and unreasonable IID lockouts, assessing expensive lockout fees against Plaintiff and Class members without regard to whether these charges are

-42-

reasonable or lawful. In some states, like Tennessee, Intoxalock does so while failing to disclose that the fees it charges Plaintiff and Class members often greatly exceed the charges allowed by state law.

138. By charging Plaintiff and Class members significantly more than is reasonable or permitted by law – *e.g.*, more than double the amount Tennessee allows to be charged as a lockout fee – Intoxalock has breached the leases it entered into with Plaintiff and other members of the Class. It has also acted in bad faith, capriciously, and without honesty in fact; failing to live up to the reasonable contractual expectations of Plaintiff and Class members and violating the covenant of good faith and fair dealing existing under every state's common law.

139. In Tennessee, by way of example, Intoxalock's lockout fees are unlawful because: (1) they are excessive by statute, which caps temporary "lockout fees" at $25.00; (2) they are set at unreasonable rates, as Intoxalock's lockout process is unnecessarily punitive and assesses the lockout fees notwithstanding whether Plaintiff or Class members actually "caused" the lockout to occur, as required by the lease; and (3) they are often grossly unfair, as Intoxalock constantly monitors the IID and the customer's car battery and retrieves from Plaintiff and Class members all of the necessary data to know whether Plaintiff or Class members attempted to "tamper" with the IID or battery to avoid detection, which would justify the lockout fee, or whether the car battery's charge had merely drained overnight, which should not.

140. Intoxalock's uniform course of conduct lacks honesty in fact and is inconsistent with the justified expectation that Intoxalock would charge reasonable

-43-

and lawful amounts to its customers for such fees and charge reasonable fees for such services. Through it's wrongful conduct, Intoxalock unfairly prevented Plaintiff and each member of the Class from receiving the full benefits of their leases.

141. Plaintiff and each member of the Class has also been directly and proximately harmed by Intoxalock's breach of the covenant of good faith and fair dealing in that each paid overcharges or paid more for fees, including lockout fees, than reasonable and/or lawfully permitted.

## COUNT TWO

### VIOLATION OF IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS CLAIM, IOWA CODE ANN. § 714H.1 ET SEQ.

142. Plaintiff realleges and incorporates by reference the allegations contained in Paragraph Numbers 1-141 above as if fully set forth in this Count, to the extent not inconsistent with the claims asserted in this Count.

143. Plaintiff brings this Count on behalf of himself and all Class members.

144. Intoxalock's actions, as set forth above, occurred in the conduct of trade or commerce.

145. The Iowa Private Right Act allows any "consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act" to bring a claim for "actual damages." Iowa Code Ann. § 714H.5(1),

146. Intoxalock is a "person" under Iowa Code § 714H.2(7).

147. Plaintiff is a "consumer," as defined by Iowa Code § 714H.2(3), who leased one or more Ignition Interlock Devices from Intoxalock.

-44-

148. The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA")

prohibits any

> "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise."

Iowa Code § 714H.3.

149. Within the Iowa Consumer Fraud Act, "deception" means "an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714H.2(5).

150. As described above, Intoxalock participated in misleading, false, or deceptive acts that violated the Iowa CFA with the intent that Plaintiff and other Class members rely on it.

151. In the course of Intoxalock's business, it, among other violations, willfully misrepresented material facts and failed to disclose and actively concealed material facts. Intoxalock engaged in unfair and deceptive trade practices, unconscionable acts or practices, including the following: representing that Plaintiff and Class members were liable for unnecessary or unreasonable lockout fees, especially when those fees were in excess of the amount permitted by state law; misrepresenting the "typical monthly costs" of leasing an IID; misrepresenting that a properly installed IID would do no damage to the vehicles of Plaintiff and Class members; representing that

-45-

lockouts were "caused" by Plaintiff and Class members, such that a lockout fee in any amount was justified; failing to disclose that lockout fees of $81.94 or $54.63 or any other amount bear no relation to the "service" allegedly provided by Intoxalock to "unlock" the IID; and failing to reveal material facts, the omission of which mislead or deceived Plaintiff and Class members, which facts could not reasonably have been known by Plaintiff and Class members.

152.    Accordingly, Intoxalock engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, false pretense, or false promise, or the misrepresentations, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with leasing IIDs. Intoxalock's acts had the capacity, tendency, or effect of deceiving or misleading consumers, including Plaintiff and other Class members.

153.    Through the actions or omissions described, Intoxalock engaged in unfair and deceptive business practices in violation of the Iowa CFA.

154.    Plaintiff and other Class members reasonably relied upon Intoxalock's false misrepresentations. They had no way of knowing that Intoxalock's representations were false and misleading. As alleged herein, Plaintiff and Class members could not, and did not, unravel Intoxalock's deception on their own and were not aware of the unfairness and deception involved in Intoxalock's leasing of IIDs prior to signing their own leases.

155.    Intoxalock's unfair or deceptive acts or practices, deception, fraud, misrepresentation, concealment, suppression, or omission of material facts were likely

to, and did in fact deceive reasonable consumers, like Plaintiff and other Class members.

156. As described above, Intoxalock intentionally and knowingly misrepresented material facts regarding the leasing of IIDs with the intent to mislead Plaintiff and other Class members.

157. As an Iowa-based company, Intoxalock knew or should have known that its conduct violated the Iowa CFA.

158. As alleged above, Intoxalock made material representations about the fees charged to Plaintiff and other Class members and about temporary lockouts and lockout fees that were either false or misleading.

159. Intoxalock owed Plaintiff and other Class members a duty to disclose the truth about all fees charged under the IID leases, especially fees charged for temporary lockouts purportedly – but not actually – "caused" by them.

160. As a direct and proximate result of Intoxalock's conduct, Plaintiff and other Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Intoxalock's conduct in that Plaintiff and other Class members were overcharged certain fees. These injuries are the direct and natural consequence of Intoxalock's misrepresentations and omissions.

161. Pursuant to Iowa Code § 714H, Plaintiff seeks actual damages; statutory damages up to three times the amount of actual damages as a result of Intoxalock's willful and wanton disregard for the rights of others; attorneys' fees; and such other equitable relief as the Court deems necessary.

-47-

## COUNT THREE

## (ALTERNATIVELY)

## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT
### Tenn. Code Ann. § 47-18-101 et seq.

162.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraph Number 1-161 above as if fully set forth in this Count, to the extent not inconsistent with the claims asserted in this Count.

163.    To the extent Iowa's Consumer Fraud Act does not apply or the Court certifies a Tennessee Class only, Plaintiff brings this Count on behalf of himself and Class members residing in the State of Tennessee.

164.    Plaintiff and Tennessee Class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

165.    Intoxalock is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

166.    Intoxalock's conduct complained of herein affected "trade," "commerce" and/or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

167.    The Tennessee Consumer Protection Act ("TCPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "(12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law;" "(13) Representing that a service, replacement or repair is needed when it is

-48-

not;" and "(15) Failing to disclose that a charge for the servicing of any goods in whole or in part is based on a predetermined rate or charge, or guarantee or warranty, instead of the value of the services actually performed." Tenn. Code Ann. § 47-18-104.

168. Tennessee's Ignition Interlock Device Program rules provide, in pertinent part, that "the fees for leasing, buying, monitoring, servicing, installing, and removing the BAlID shall be *at a reasonable rate set by the manufacturer*." See Tenn. Comp. R. & Regs., Ch. 1340-03-06-.15 (emphasis added). Tennessee's Ignition Interlock Device Program rules further provide, in pertinent part, that *"[m]anufacturers may charge reasonable and customary fees, not to exceed a total of twenty-five dollars ($25.00), for a temporary lockout code."*[40] See Tenn. Comp. R. & Regs., Ch. 1340-03-06-.15.[41]

169. In the course of Intoxalock's business, it willfully failed to disclose and actively concealed that "lockout fees" were limited by the State of Tennessee to $25.00 and were limited by other states. A reasonable American consumer would expect that the amount of lockout fees would not exceed a reasonable rate, much less a state's explicit fee limit. Accordingly, Intoxalock engaged in unfair and deceptive trade practices, in unfair methods of competition, unconscionable acts or practices, including representing that Plaintiff and Tennessee Class members were liable for lockout fees

---

[40]A "temporary lockout" is described by Intoxalock as follows: "When your device is temporarily locked, it will start a countdown of several minutes. Once the timer runs out, you'll be able to re-submit a breath sample. If the breath sample is clean, you will be able to start the car."

[41]https://tnignitioninterlock.zendesk.com/hc/en-us/articles/360031849153-How-much -will-this-cost-

in excess of the amount permitted by state law; representing that a IID user needed to unlock an IID when there was no reasonable justification for he or she having to pay any lockout fee; failing to disclose that lockout fees of $81.94 or $54.63 bear no relation to the service provided; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that person reasonably believes the represented and suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of the representations of fact made in a positive manner.

170.    Intoxalock's acts or omissions had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the leases.

171.    Intoxalock engaged in unfair and deceptive business practices in violation of the TCPA.

172.    Plaintiff and Tennessee Class members reasonably relied upon Intoxalock's false misrepresentations, omissions, and misleading statements, and had no way of knowing that Intoxalock's representations were false and misleading. As alleged herein, Intoxalock engaged in sophisticated methods of deception. Plaintiff and Tennessee Class members did not, and could not, unravel that deception on their own,

-50-

as the lease terms and charges in relation to state laws are complicated, and Plaintiff and other Tennessee Class members were not aware that Intoxalock had decided to ignore Tennessee law.

173. Intoxalock's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

174. Intoxalock intentionally and knowingly misrepresented material facts regarding the lockout fees with intent to mislead Plaintiff and the Tennessee Class. In the alternative (or in addition), Intoxalock failed to disclose material facts to Plaintiff and the Tennessee Class, including but not limited to the fact that the amount of lockout fees were prohibited by law.

175. Intoxalock knew or should have known that its conduct violated the TCPA.

176. Intoxalock owed Plaintiff and the Tennessee Class a duty to disclose the truth about the lockout fees because it knew that the lockout fees provided for in its leases greatly exceeded the state limits for such charges. Intoxalock had a duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the costs of having the IIDs leased by Plaintiff and Tennessee Class members.

177. Intoxalock's conduct proximately caused injuries to Plaintiff and the other Tennessee Class members.

178. Plaintiff and the other Tennessee Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Intoxalock's conduct in that Plaintiff and the other Tennessee Class members grossly overpaid for lockout fees. These injuries are the direct and natural consequence of Intoxalock's misrepresentations, fraud, deceptive practices, and omissions.

179. Intoxalock's violations present a continuing risk to IID lessees.

180. Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiff and the Tennessee Class members seek monetary relief against Intoxalock measured as actual damages in an amount to be determined at trial, treble damages as a result of Intoxalock's willful or knowing violations, attorney's fees, and any other just and proper relief available under the TCPA.

## COUNT FOUR

## COMMON LAW FRAUD

181. Plaintiff realleges and incorporates by reference the allegations contained in Paragraph Numbers 1-180 above as if fully set forth in this Count, to the extent not inconsistent with the claims asserted in this Count.

182. As described above, Intoxalock made false representations of material facts to Plaintiff and Class members that it knew to be untrue, including, among other misrepresentations: informing Plaintiff and other Class members via its website that the "typical monthly cost" for Ignition Interlock Devices was between $60 and $90, when it knew such costs greatly exceeded even the maximum typical monthly cost it represented to Plaintiff and Class members; representing to Plaintiff and Class

-52-

members that its Ignition Interlock Devices ("IIDs"') would not damage their vehicles when it knew that the IIDs would severely drain car batteries from which they drew power and destroy them; and representing to Plaintiff and Class members that "lockouts" were "caused" by them when, in truth, they were not, as IIDs had drained their car batteries. Intoxalock knew, or should have known, that Plaintiff and Class members had not "tampered" with the IIDs to trigger a lockout. Intoxalock had the knowledge, means, and ability to alert Plaintiff and Class members that their car batteries were approaching a charge level that would inevitably result in a "lockout" and "lockout fees" but did not do so. Intoxalock also charged Plaintiff and Class members fees, including lockout fees, that exceeded state mandated limits.

183.    Intoxalock intended to induce the Plaintiff and Class members to act in reliance on such representations and Plaintiff and Class justifiably relied on those false representations.

184.    Plaintiff and Class members suffered damages as a result of that reliance, as described above, in detail.

## COUNT FIVE

## UNJUST ENRICHMENT

185.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1-184 above as if fully set forth in this Count, to the extent not inconsistent with the claims asserted in this Count.

186.    Plaintiff brings this count individually and on behalf of the Class members against Intoxalock.

-53-

187.    Plaintiff and the Class members conferred benefits on Intoxalock, as described above, in the nature of excessive fees and overcharges. Specifically, Intoxalock received monies as a result of overcharging Plaintiff and Class members during their lease-terms and wrongfully charged and accepted excessive fees, and retained these benefits to the detriment of Plaintiff and the Class which, in justice and equity, it should not be permitted to keep.

188.    Intoxalock's enrichment at the expense of Plaintiff and the Class was unjust and inequitable. Intoxalock misrepresented or failed to disclose the facts concerning fees and caused Plaintiff and the Class members to lose money and/or to overpay as a result thereof.

189.    Plaintiff and Class members were injured as a direct and proximate result of Intoxalock's breaches and the conduct hereinbefore complained of because they would not have leased Ignition Interlock Devices ("IIDs") from Intoxalock, but would have instead chosen to lease IIDs from one of Intoxalock's competitors.

190.    Because Intoxalock's retention of the benefits conferred on them by the Plaintiff and Class members is unjust and inequitable, Intoxalock must pay in restitution to Plaintiff and Class members all such unjustly collected monies as may be ordered by the Court.

191.    As a result of Intoxalock's wrongful conduct, Plaintiff and the Class are entitled to restitution from and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Intoxalock, plus attorneys' fees, costs, and interest thereon.

-54-

## VIII. JURY DEMAND

192.    Plaintiff requests a jury on all issues so triable.

## IX. PRAYER FOR RELIEF

Plaintiff, on behalf of himself and all others similarly situated, requests the Court enter judgment against Intoxalock, as follows:

A.    That summons be issued and Intoxalock be required to answer according to law;

B.    That the Court certify the Class proposed herein, appoint the named Plaintiff as the Class Representative for the proposed Class, and appoint the undersigned counsel as Class Counsel;

C.    That Plaintiff and the Class be awarded a declaratory judgment declaring that Intoxalock's conduct alleged herein violated the aforementioned laws;

D.    That Plaintiff and the Class be awarded a judgment for all available compensatory or statutory damages, including interest thereon, in an amount to be proven at trial;

E.    That Intoxalock disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of devices, or to make full restitution to Plaintiff and the Class;

F.    That Intoxalock be enjoined from further deceptive practices.

G.    That Plaintiff and the Class be awarded a judgment for the attorney fees, litigation expenses and costs of suit;

-55-

H. That Plaintiff and the Class be granted leave to amend their Complaint to conform to the evidence produced at trial; and

I. That Plaintiff and the Class be awarded such other and further relief as the Court deems proper under the circumstances.

Respectfully submitted, this 8th day of December, 2023.

LACY, PRICE & WAGNER, P.C.

*/s/ W. Allen McDonald*
W. Allen McDonald
Email: amcdonald@lpwpc.com
LACY, PRICE & WAGNER, P.C.
249 North Peters Road, Suite 101
Knoxville, Tennessee 37923
Tel: 865.246.0800
Fax: 865.690.8199

*/s/ Christopher T. Cain*
Christopher T. Cain
Email: chris@lpwpc.com
LACY, PRICE & WAGNER, P.C.
249 North Peters Road, Suite 101
Knoxville, Tennessee 37923
Tel: 865.246.0800
Fax: 865.690.8199

*Attorneys for Plaintiff*

-56-